THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* CHICAGO FIRE FIGHTERS UNION, LOCAL NO. 2, *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 80-696

Opinion filed August 12, 1981.

Anthony Intini, III, of Intini and Goldstein, of Chicago, for appellants.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Maureen J. Kelly, Assistant Corporation Counsel, and Mary Mathewson and Myron N. Schreiber, senior law students, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendants, Chicago Fire Fighters Union, Local No. 2, and its president, Frank J. Muscare, were found to be in contempt of court for refusing to obey a preliminary injunction enjoining them from striking against plaintiff, City of Chicago. For their direct civil contempt, the union was fined $40,000 and Muscare was fined $5,000. Muscare was also

found guilty of direct criminal contempt and was sentenced to five months imprisonment. Defendants appeal.

On February 14, 1980, plaintiff filed a complaint to enjoin the union, and its officers and trustees, and the International Association of Fire Fighters, AFL-CIO, and its representative, from engaging in a strike against the city. The complaint alleged that defendants had ceased working and had refused to return to work although ordered to do so by the city; had encouraged and induced other fire department employees to stop working; and were picketing plaintiff's facilities. The city charged that defendants' conduct constituted a strike; that their acts were illegal, wrongful and contrary to the law; that such conduct interfered with the city's operations and presented an immediate threat to the health, safety and welfare of the city and its citizens; and that the city would suffer irreparable harm and would be unduly prejudiced if defendants were not restrained and enjoined immediately without notice or bond. Similar allegations were set forth in an emergency motion for a temporary restraining order which accompanied the complaint. Both the complaint and emergency motion were verified by Richard G. Albrecht, the Chicago Fire Commissioner. That same day, the trial court found that defendants were engaging in an illegal strike which impaired the functioning of the fire department and jeopardized the health, safety and welfare of the citizens. Accordingly, the court entered an *ex parte* temporary restraining order enjoining defendants as follows:

"A. From striking against the CITY OF CHICAGO;

B. From promoting, encouraging, authorizing, sanctioning, instigating or lending support or assistance to any strike, work stoppage or work slow down of the employees of the CITY OF CHICAGO;

C. From interfering in any manner either directly or indirectly with the operations of the plaintiff, CITY OF CHICAGO'S Fire Department, or any other operations of the plaintiff, CITY OF CHICAGO;

D. From causing, participating in or permitting any picketing in or about said Fire Department facilities or other facilities of the CITY OF CHICAGO;

E. From coercing, interfering with, or preventing any employee of the plaintiff, CITY OF CHICAGO, from engaging in the performance of his lawful duties and functions on behalf of the plaintiff, CITY OF CHICAGO;

F. From engaging in acts or conduct calculated to incite or encourage the employees of plaintiff's Fire Department to ignore or disobey instructions, directions and orders to said

employees from the appointed Fire Commissioner of plaintiff and the duly elected Mayor of plaintiff;

G. From undertaking and engaging in acts of insubordination and refusal to do their duties as required by the ordinances of the plaintiff, CITY OF CHICAGO and the Rules and Regulations, Practices and Procedures of plaintiff's Fire Department or directions and orders, oral or written, which have been issued or which may hereinafter be issued by the appointed Fire Commissioner of plaintiff."

Notice and copies of the order were served upon defendants later that day. Albrecht issued an emergency recall notice to all officers and members of the fire department ordering them to report to work immediately and noting that those persons failing to report as ordered would be subject to disciplinary action and would be in violation of the court order.

Two days later, plaintiff moved for a rule to show cause why defendants should not be held in contempt for failing to obey the temporary restraining order. Defendants filed an appearance and a motion to dismiss the complaint and dissolve the temporary restraining order. In the motion, later verified in open court by Muscare, defendants did not deny that they had initiated a strike action. They denied, however, that such action jeopardized public health and safety since they remained ready to provide protection in accordance with their strike plan. Defendants admitted that they had not returned to work and indicated that they did not intend to do so until a contract was ratified. The gist of the motion was that the complaint was rendered moot by virtue of actions or statements of the city having the effect of terminating fire department employees from service. In support of this position, defendants pointed to Albrecht's back to work order and to Mayor Byrne's letter to Muscare stating that group coverage for medical insurance paid by the city would expire at the end of the pay period for those firefighters on strike. Before conducting a hearing on these motions, the court suggested that the city and fire fighters meet together in an attempt to reach agreement.

On February 17, 1980, after hearing argument of counsel, the court denied defendants' motion to dismiss the complaint. The court found that the city had not effectively terminated employees of the fire department. Defendants were given leave to file an answer and response to plaintiff's motion for a rule to show cause. Later that day, defendants presented their answer, also verified by Muscare in open court, admitting that the union membership had voted to authorize a strike; that they had stopped work and had induced and encouraged other employees of the fire department to stop work; that they were presently picketing the city's facilities; that they were engaging in a strike; that they had not terminated

the strike and returned to work as instructed; and that their strike was contrary to the law. Defendants denied that their actions created an immediate threat to public health, safety and welfare inasmuch as they were volunteering their services for emergencies.

At this proceeding, plaintiff requested the issuance of a preliminary injunction providing the same relief provided by the temporary restraining order. After hearing testimony, the court entered a preliminary injunction prohibiting the conduct set forth in paragraphs A through E of the temporary restraining order. Plaintiff then requested that its motion for a rule to show cause be heard. In support of its motion, plaintiff argued that defendants' admissions in their verified motion to dismiss and answer constituted evidence of direct contempt. The court expressed its belief that based on the evidence presented, everyone involved was directly contemptuous of the court's orders. Muscare and several union representatives were then given an opportunity to purge themselves of contempt. Asked individually whether they would comply with the court's orders by directing union members to return to work, Muscare and the other union officials responded that they would not. Based upon their own pleadings and affirmations made under oath, both in and out of court, the court found that these individuals were contumacious and in wilful defiance of the court's temporary restraining order and preliminary injunction. By an order of direct civil contempt entered on February 18, 1980, the court assessed daily fines upon the union in the amount of $25,000, and upon Muscare in the amount of $5,000, for each day that the strike or other contumacious conduct continued.

On February 19, 1980, prior to resumption of the contempt proceedings against the remaining union representatives, the court appointed Sherman Carmell, an attorney, as *amicus curiae*. Carmell suggested that additional meetings be conducted and that the court defer further action on the contempt petition until later that day. The parties agreed to this proposal and attended the arranged meetings.

The following day, on February 20, 1980, Carmell reported to the court that no progress had been made. When the court resumed its proceedings, counsel for defendants complained that plaintiff did not have clean hands, and asked that institution of further contempt citations be suspended until the city agreed to participate in immediate negotiations without preconditions. The court responded that if defendants ordered their members to return to work, the court would order plaintiff to negotiate. Following this colloquy, the parties met again and returned to court that evening with a back to work agreement. The agreement, subject to approval of the union's membership and executive board and the city, provided for an immediate return to work pursuant to a transition plan to be implemented by the fire commissioner. Upon their

return to work, the parties' negotiating teams were to enter into continuous negotiation. After reading the agreement into the record, the court suspended the daily fines except for two days, and continued the matter to the following day.

On February 21, 1980, plaintiff complained to the court that defendants were in contempt of the agreement, lacked good faith, and wished to dictate the terms under which the fire fighters would return to work. Plaintiff requested permission to withdraw from the agreement. The city wanted control of the firehouses with its employees in them and a cooling-off period before resumption of collective bargaining. The court noted that there had been a misunderstanding on the part of the union; the union had believed it was permitted to have input into the transition plan. Defendants responded that the fire department employees would comply with the city's instructions concerning where they should report for work. The court then directed the parties to resume negotiations, reiterating that picketing was not allowed.

Later that day, plaintiff renewed its request to withdraw from the agreement and to proceed with further contempt hearings alleging that defendants violated the agreement. An evidentiary hearing was conducted at which conflicting testimony was adduced concerning the union's picketing activities and the implementation of the transition plan. At the conclusion of the hearing, the court found that defendants had breached the agreement and had displayed a lack of good faith by continuing to engage in picketing and by instructing union members to remain at their companies instead of awaiting directions from the city as to where employees were to report. The court specifically noted that Muscare had stated in open court that morning that upon ratification of the agreement, he advised union members to continue picketing. In accordance with these findings, the court granted plaintiff's motion to rescind and withdraw from the agreement.

Contempt proceedings resumed and the remaining union representatives were afforded an opportunity to purge themselves of civil contempt by indicating that they would cease striking and obey the preliminary injunction. Upon this refusal, each official was found in contempt and fined $1,000 per day. The court vacated the order suspending the fines and reinstated the fines imposed earlier upon Muscare and several other officers. Next the court found Muscare guilty of direct criminal contempt and sentenced him to five months imprisonment, stating as follows:

> "Frank Muscare, this is probably one of the most difficult things that a man can do. * * * The acts you involved yourself in are reprehensible and cannot be allowed to be excused. I'm now finding you guilty of direct criminal contempt, which is an act in

total disrespect of the Court or its process, and which tends to bring the Court into total disrepute and presents a total obstruction of justice.

Your conduct * * * is contemplated and directed against the majesty of the law and dignity and the authority of this Court. It is conduct directly intended to embarrass and obstruct this Court in its administration of justice, and I can see no other purpose but being calculated to bring the administration of the law in disrespect and disregard. * * * And that cannot be tolerated in our society in 1980, and it will not be tolerated."

Both the order of commitment and order adjudging Muscare guilty of direct criminal contempt found that Muscare was in wilful contempt for having refused in open court, "directly and contumaciously," to obey the preliminary injunction entered by the court on February 17, 1980. The latter order disclosed that the finding of direct criminal contempt was based upon admissions contained in defendants' motion to dismiss and answer, both verified by Muscare, as well as Muscare's refusal, upon inquiry of the court, to order union members back to work.

On March 3, 1980, Muscare filed an appeal from the order finding him guilty of direct criminal contempt. After the parties entered into a strike settlement agreement which terminated their dispute, Muscare's appeal was dismissed.

Thereafter, on March 13, 1980, defendants filed a motion seeking to vacate the prior orders of the court, to dismiss the case with prejudice, to reconsider Muscare's contempt order and commute his sentence, and to vacate and suspend all fines levied against all defendants. After hearing argument of counsel, the trial court declined to reconsider its order finding Muscare in direct criminal contempt but granted a reduction in the fines imposed. Muscare's fine was reduced from $5,000 per day to a total amount of $5,000; the union's daily fine of $25,000 was converted to a total sum of $40,000. This appeal followed.

On appeal defendants initially contend that the order finding Muscare guilty of direct criminal contempt is not supported by the evidence. ■■ Contempt of court has been defined as conduct "calculated to embarrass, hinder or obstruct a court in its administration of justice or to derogate from its authority or dignity or bring the administration of law into disrepute." (*In re Estate of Melody* (1969), 42 Ill. 2d 451, 452, 248 N.E.2d 104.) In general, civil contempt proceedings are instituted to coerce or compel obedience to an order of the court for the benefit of the opposing litigant, whereas criminal contempt proceedings are instituted to vindicate the authority and dignity of the court. (*People ex rel. Scott v. Police Hall of Fame, Inc.* (1979), 69 Ill. App. 3d 501, 387 N.E.2d 856.) A

direct criminal contempt is one which takes place in the presence of the judge, making elements of the offense matters within the judge's personal knowledge and tending directly to obstruct and prevent the administration of justice. (*People v. Jashunsky* (1972),.51 Ill. 2d 220, 282 N.E.2d 1, *cert. denied* (1972), 409 U.S. 989, 34 L. Ed. 2d 256, 93 S. Ct. 331; *People v. Howarth* (1953), 415 Ill. 499, 114 N.E.2d 785.) Where the contumacious conduct is committed in the presence of the court, the contemnor may be adjudged and punished in a summary manner. (*People v. Tomashevsky* (1971), 48 Ill. 2d 559, 273 N.E.2d 398.) The power to punish for contempt is discretionary, and should be exercised sparingly and only when necessary to prevent actual, direct obstruction of justice. (*Board of Junior College District No. 508 v. Cook County College Teachers Union, Local 1600* (1970), 126 Ill. App. 2d 418, 262 N.E.2d 125, *cert. denied* (1971), 402 U.S. 998, 29 L. Ed. 2d 165, 91 S. Ct. 2168.) An order imposing punishment for direct contempt must state, or the record must show, the specific acts upon which it is based. (*People v. Miller* (1972), 51 Ill. 2d 76, 281 N.E.2d 292.) It is the duty of the reviewing court to determine whether there is sufficient evidence to support the finding of contempt and whether the court considered only facts within its personal knowledge. *People v. Graves* (1979), 74 Ill. 2d 279, 384 N.E.2d 1311.

■■ ■ From our examination of the record we find ample evidence to support the trial court's ruling that Muscare was guilty of direct criminal contempt. By a motion to dismiss and answer, both verified by Muscare, defendants admitted that they were engaging in and encouraging the prohibited strike action; that they were picketing the city's facilities; and that they would not return to work until ratification of a contract. On February 17, 1980, Muscare stated in court that he refused to obey the preliminary injunction enjoining defendants from striking, encouraging others to strike, interfering with the city's operations, and picketing. For his defiance of the court's order, Muscare initially was held in direct civil contempt and, as a coercive measure, was fined. Thereafter, based on the same contumacious conduct of disobedience, Muscare was found to be guilty of direct criminal contempt and, as a punitive measure, was sentenced to imprisonment. It is clear that the same conduct can amount to both civil and criminal contempt, and that the same acts may justify the court in resorting to both coercive and punitive measures. (*United States v. United Mine Workers* (1947), 330 U.S. 258, 91 L. Ed. 884, 67 S. Ct. 677.) We believe Muscare's disobedience of the preliminary injunction, as revealed by his pleadings and verbal affirmation in the presence of the court, demonstrates conduct calculated to obstruct the court in its administration of justice and to lessen its authority and dignity. (See *People v. Berof* (1937), 367 Ill. 454, 11 N.E.2d 936.) In view of this direct

criminal contumacious conduct, the court was warranted in adding a punitive sanction to vindicate the authority of the court.

Defendants argue, however, that the court attributed statements to Muscare which he never made and suggest that the court relied upon such remarks in finding Muscare guilty of direct criminal contempt. The record belies this contention. The challenged statements were recounted in the course of the court's ruling on plaintiff's motion to withdraw from the agreement. Nowhere in the order of commitment or the contempt order were those comments or any agreement mentioned as grounds for the adjudication of criminal contempt. Rather, the latter order specifically identifies the acts upon which the finding of criminal contempt was based to be the admissions contained in the verified pleadings and Muscare's verbal refusal, upon inquiry of the court, to abide by the court's order.

Equally without merit is defendants' assertion that Muscare was not given an opportunity to purge himself of contempt. On February 17, 1980, the court asked Muscare to follow its order, and Muscare answered that he would not comply. That the court waited until the contempt proceedings resumed to impose a punitive sanction for such defiance of the preliminary injunction does not mean that the court was required to afford Muscare another opportunity to purge himself of contempt.

■■ Defendants complain further that the court acted hastily in dealing with Muscare on the criminal contempt charge. Yet, at the same time, they advance the seemingly contradictory argument that since Muscare did not commit different acts between February 17 and 21, the court erred in waiting until February 21 to impose a punitive sanction for contumacious conduct allegedly occurring on February 17. We reject both contentions. While direct criminal contempt may be adjudicated and punished in a summary manner (*People v. Tomashevsky*), there is no requirement that punishment must be imposed summarily. While the power to punish for contempt should be exercised with caution (*People v. Loughran* (1954), 2 Ill. 2d 258, 118 N.E.2d 310), we do not believe that the court acted hastily in punishing Muscare's wilful violation of its order as criminal contempt. The court attempted first to compel compliance through a civil sanction. Only when the fine proved ineffectual to coerce obedience and the strike and picketing activities continued did the court resort to a punitive measure.

We also find no support in the record for defendants' charge that the trial court became too personally involved in the dispute and abused its discretion. A court that grants an injunction is vested with wide discretion in enforcing obedience of its order. (*Board of Junior College District No. 508 v. Cook County College Teachers Union, Local 1600.*) The interests of orderly government demand respect and compliance with orders

issued by courts having jurisdiction of the persons and subject matter, and one who wilfully refuses obedience does so at his peril. (*United States v. United Mine Workers.*) In view of Muscare's adherence to his position of defiance of the court's injunction and the threat to public safety occasioned by his behavior, the court did not abuse its discretion in adjudging and sentencing Muscare for direct criminal contempt.

Defendants finally contend that the union, a voluntary unincorporated association, cannot be fined. Alternatively, they urge that the fine is excessive.

■■ The generally accepted common law rule is that a voluntary unincorporated association, having no separate legal existence independent of the members who compose it, cannot sue or be sued in its own name. (*American Federation of Technical Engineers, Local 144 v. La Jeunesse* (1976), 63 Ill. 2d 263, 347 N.E.2d 712; *Mulligan v. Teamsters Union, Local No. 971* (1978), 59 Ill. App. 3d 587, 375 N.E.2d 891.) An exception, however, exists in equity which allows a representative suit to be brought in the names of a portion of the members of the association who were suing for themselves and also in behalf of all other members of the association. (*American Federation of Technical Engineers, Local 144, v. La Jeunesse; Fields Cadillac, Inc. v. New Car Dealers Committee* (1980), 88 Ill. App. 3d 682, 410 N.E.2d 1126.) Suits in equity against voluntary unincorporated associations have been sustained where service was had upon some representative of the group who could be said to represent the body of the membership. *Illinois Power Co. v. Latham* (1973), 15 Ill. App. 3d 156, 303 N.E.2d 448.

Here the 4,000 members of the union were too numerous to be served personally with the complaint and notice of the temporary restraining order and preliminary injunction. Service was had, however, upon the union's officers and trustees, who were sued individually and as representatives of the membership. Defendants filed a general appearance and admitted in their answer that these representative parties would fairly and adequately protect the interests of the class members engaging in the work stoppage. We thus find that the union was amenable to suit and that the court had jurisdiction to fine the union for its contumacious conduct.

We also conclude that the $40,000 fine imposed upon the union was not excessive. The original fine of $25,000 per day was reduced to $40,000, a figure apparently based upon the size of the union's membership. Defendants assert that the fine should be reduced because the fire fighters donated labor in excess of $1,000,000. Nevertheless, in the light of the danger posed to the public during this 22-day strike, we cannot say that the trial court abused its discretion in imposing a fine of $40,000.

For the foregoing reasons, the order of the circuit court of Cook

County finding Muscare guilty of direct criminal contempt is affirmed. The order fixing the union's fine is also affirmed.

Affirmed.

McGILLICUDDY and WHITE, JJ., concur.